| | |
|---|---|
| 1 | UNITED STATES COURT OF APPEALS |
| 2 | FOR THE SECOND CIRCUIT |
| 3 | - - - - - - |
| 4 | August Term, 2022 |
| 5 | (Argued:  May 2, 2023        Decided:        November 6, 2024) |
| 6 | Docket No. 22-2650 |

7  _____

8   SEAN FLYNN, DEAN KARLAN, JONATHAN MORDUCH, DAVID
9   MYERS, and JEAN TWENGE, individually and on behalf of all others
10  similarly situated,

11                           *Plaintiffs-Appellants*,

12                                  - v. -

13  MCGRAW HILL LLC and MCGRAW HILL EDUCATION, INC.,

14                          *Defendants-Appellees*.[*]
15  _____

16  Before:  KEARSE, JACOBS, and MENASHI, *Circuit Judges*.

---

[*]      The Clerk of Court is instructed to amend the official caption to
conform with the above.

Appeal by plaintiff authors from so much of a judgment of the United States District Court for the Southern District of New York, Lorna G. Schofield, *Judge*, as dismissed their amended consolidated putative class action complaint ("Complaint") alleging that defendants breached publishing agreements by ceasing or reducing royalty payments on certain revenues generated from defendants' online platform that hosts and delivers plaintiffs' electronic textbooks and related course materials. The district court granted defendants' motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the breach-of-contract causes of action for failure to state a claim, (a) ruling that the contract definitions of "net receipts" unambiguously foreclosed plaintiffs' claims of right to royalties on sales of any products other than their textbooks, and (b) ruling that defendants' reduction of royalties on textbooks sold through the online platform did not violate the contracts' requirement that the publishers distribute the textbooks at their "own expense." On appeal, plaintiffs contend that the court erred in interpreting the contracts' "net receipts" and "own expense" clauses, or at least erred in finding the "net receipts" clauses unambiguous. We reject plaintiffs' challenge to the dismissal of their claims based on alleged breach of the "net receipts" clauses; however, we find merit in their challenge to the ruling that the Complaint failed to state a breach-of-

1    contract claim based on the "own expense" clauses.  *See Flynn v. McGraw Hill LLC*, No.

2    21 Civ. 614, 2022 WL 103537 (S.D.N.Y. Jan. 11, 2022).

3               Vacated in part, and remanded.

4               ALEXANDER W. AIKEN, Seattle, Washington (Susman
5               Godfrey, Seattle, Washington; Daniel L. Berger, Grant &
6               Eisenhofer, New York, New York; Chanler A. Langham,
7               Susman Godfrey, Houston, Texas, on the brief), *for*
8               *Plaintiffs-Appellants*.

9               SAUL B. SHAPIRO, New York, New York (Stephanie
10               Teplin, Andrew I. Haddad, Patterson Belknap Webb &
11               Tyler, New York, New York, on the brief), *for*
12               *Defendants-Appellees*.

13    KEARSE, *Circuit Judge*:

14               Plaintiff textbook authors Sean Flynn, Dean Karlan, Jonathan Morduch,

15    David Myers, and Jean Twenge (collectively "Plaintiffs" or the "Authors") appeal from

16    so much of a judgment of the United States District Court for the Southern District of

17    New York, Lorna G. Schofield, *Judge*, as dismissed their amended consolidated putative

18    class action complaint ("Complaint") alleging that defendants McGraw Hill LLC and

19    McGraw Hill Education, Inc. (collectively "McGraw Hill" or the "Publisher"), breached

20    publishing agreements by ceasing or reducing royalty payments on certain revenues

1    generated from McGraw Hill's online platform that hosts and delivers electronic

2    textbooks and related course materials.  The district court granted McGraw Hill's

3    motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' breach-of-contract

4    causes of action for failure to state a claim, ruling (a) that the contract definitions of "net

5    receipts" unambiguously foreclosed Plaintiffs' claim of right to royalties on sales of any

6    products other than their textbooks, and (b) that McGraw Hill's decision to reduce

7    royalties on sales through the platform did not violate the contracts' requirement that

8    the Publisher distribute the textbooks at its "own expense."  On appeal, Plaintiffs

9    contend that the court erred in interpreting the contracts' "net receipts" and "own

10   expense" clauses, or at least erred in finding the "net receipts" clauses unambiguous.

11   For the reasons that follow, we reject Plaintiffs' challenge to the dismissal of their claims

12   based on the "net receipts" clauses but find merit in their challenge to the ruling that

13   the Complaint failed to state a breach-of-contract claim based on the "own expense"

14   clauses.  Accordingly, we vacate so much of the judgment as dismissed the claims of

15   breach of contract and remand for further proceedings.

# I. BACKGROUND

The Authors entered into their respective publishing contracts with McGraw Hill or its predecessors-in-interest ("Publishing Agreement" or "Contract") at various times dating back to 1979.  This action centers on McGraw Hill's distribution of Plaintiffs' textbooks in electronic form ("ebooks").  The following description of the controversy accepts the factual allegations in the Complaint as true, as required with respect to a Rule 12(b)(6) motion to dismiss, and includes terms of the agreements relied on by Plaintiffs in the Complaint.

A.  *Publishing Agreement Provisions as to Royalties and Expenses*

Each Publishing Agreement pertained to a textbook with a tentative title (subject to replacement with "such other title as may be mutually agreeable to the Publisher and the Author"), which was referred to in the Contract as the "'Work.'"  The Author or Authors agreed to prepare and deliver to the Publisher a manuscript for the Work; the Publisher agreed to publish the textbook and remit royalty payments to the Author(s).

1  The Contract sections at issue in this action, exemplified by the 1989 Flynn

2  Contract, include the provision that

3  [a]fter giving written notice to the Author that it has accepted the
4  Work as being in form and content satisfactory for publication, ***the***
5  ***Publisher shall publish the Work at its own expense*** . . . .

6  (Complaint ¶ 57 (quoting, with emphasis, Flynn Contract § 6.)) Section 7 of the

7  Contract governs the Publisher's obligation to pay the Author royalties ("Royalty

8  Clause" or "Royalty Contract").  It provides that "[a]s full payment to the Author, the

9  Publisher shall pay to the Author" various specified "percentage[s] of the ***Publisher's***

10  ***net receipts*** for each copy of the Work sold by the Publisher" (the "Royalty

11  Percentage"), depending on, *inter alia*, whether the copies are sold for use within or

12  outside of the United States (Complaint ¶ 58 (quoting, with emphasis, Flynn Contract

13  § 7(a)(1))); and it defines "[t]he term 'Publisher's net receipts'" to "mean the Publisher's

14  ***selling price***, less discounts, credits, and returns, or a reasonable reserve for returns"

15  (Complaint ¶ 59 (quoting, with emphasis, Flynn Contract § 7(c))).

16  The Contracts of the other Plaintiffs contain definitions of "net receipts"

17  that are "substantially similar" to that in the Flynn Contract.  (McGraw Hill brief on

18  appeal at 7 n.3.)  And all of the Plaintiffs' Contracts provide that "the Publisher" is to

19  "publish the Work" "at its own expense."  (*See*, *e.g.*, Complaint ¶¶ 7, 57, 64, 70, 71.)

The Complaint alleged that "[i]n or around 2006, McGraw Hill amended older Royalty Contracts to include a new provision making clear that the domestic royalty rate also applies to electronic sales of the works."  (Complaint ¶ 61.)  For example, the Flynn Contract "was amended on May 11, 2006 to state that the 'Royalty for electronic rights to the work is the same as the domestic royalty rate'" (*id*.); and in the Contract entered into by Plaintiffs Karlan and Morduch in 2008, the "Publisher's . . . own expense" clause states that "**the Publisher will publish the Work in book and/or electronic form at its own expense**" (*id*. ¶ 64 (quoting, with emphasis, Karlan & Morduch Contract § 10(A))).

B.  *The Original Application of the Royalty Clauses to eBooks*

In 2009, McGraw Hill launched a platform called "Connect, a Content Management System . . . for hosting ebooks and course materials."  (Complaint ¶ 34.)  The Complaint alleged that

> [e]lectronic textbooks ("ebooks" or "smartbooks") are the central element of the Connect platform and represent electronic versions of the authors' works.  Corresponding features offered on Connect ("Core Connect Content" or "CCC") are designed based on the authors' works themselves and are exclusively offered in conjunction with their works.

(*Id*. ¶ 6.)  According to the Complaint,

> [t]he Connect platform is a single online location where teachers and students can access electronic textbooks and course materials, complete assignments and track performance.  The electronic textbooks, or "ebooks," are delivered through . . . Connect, which, among other things, allows the books to be viewed online and includes certain course materials.

(Complaint ¶ 37.)  "Each Connect offering consists of an ebook" along with Core Connect Content (or "CCC"); the ebook is "sold together with CCC for a single unitary price"; and "CCC cannot be purchased exclusive of an ebook."  (*Id*. ¶ 38.)

> 39. The ebook component of a Connect textbook is an online copy of the book identical to its print form.  Many Connect ebooks also have a digital overlay including clickable links and videos, and adaptive study reviews that provide questions based on students' mastery of relevant topics. . . .

> 40. CCC includes features intended to aid instructors in teaching courses and content like PowerPoint lesson plans and test banks.  The majority of CCC is textbook-specific, meaning that it is designed to be used in conjunction with particular textbooks.  The online course materials typically include guides, presentations, and question and answer banks, as well as other aides, and commonly draw directly from the associated textbooks.  The textbook authors themselves have a significant role in developing those materials.

> 41. Textbooks are the necessary component of the Connect platform.  Not only do educators and students continue to seek high-quality textbooks for their courses, but the books also form the basis of the courses and CCC built around them.  Simply put, if the authors did not produce the textbooks, McGraw Hill would not be

able to market Connect: it would be an empty, useless platform. All of the other purposes or applications available on Connect require a textbook; without the textbook, the other applications of the platform are useless.

42. . . . . Each Connect course is specific to one textbook; it is impossible to launch a course on Connect or access CCC without selecting a textbook to serve as the basis for the course or to select multiple textbooks for use in the same course, further underscoring that textbooks are the necessary component of the Connect platform.

(*Id*. ¶¶ 39-42.)

The Complaint alleged that "Connect," in other words, "is a content-delivery platform that is functionally equivalent to the paper on which electronic copies of textbooks are printed" (*id*. ¶ 81), and serves "in essence [as] a replacement for paper versions of books" (*id*. ¶ 5). The Core Connect Content is "designed based on the authors' works themselves and [is] exclusively offered in conjunction with their works." (*Id*. ¶ 6.) The Connect platform and CCC are "not commodities in their own right," and "have little to no market value when sold separate and apart from the textbook." (*Id*. ¶ 82.)

For the first decade after Connect was introduced, McGraw Hill had an "established . . . practice of paying the Royalty Percentage on the entire net receipts of textbooks on the Connect platform." (*See* Complaint ¶ 74-75.)

C. *McGraw Hill Changes the Royalties Formula*

In November 2020, McGraw Hill informed its authors that it had "changed how it calculates and pays royalties on Connect textbook sales." (Complaint ¶ 75.) In an email to Flynn, McGraw Hill stated that

> "effective with the current royalty period, the royalty for sales of the ebook within the Connect product will be paid on the revenue attributed to the ebook component, determined proportionally based on the stand-alone list price of the ebook of corresponding duration to the Connect product divided by the list price of the Connect product. In addition, a permissions fee attributed to the [course materials] component will be paid for the re-use of the ebook content in McGraw Hill's SmartBook technology and other tools within the same Connect product. The revenue *attributed* to the [course materials] component will be any revenue not *attributed* proportionally to the ebook *or platform components*."

(*Id*. ¶ 76 (quoting November 23, 2020 email from McGraw Hill to Flynn (emphases ours)).) Thus,

> over 10 years after the introduction of Connect, McGraw Hill announced that "[e]ffective with this current royalty period," July through December 2020, it would no longer pay royalties to authors based on the entire sales price of an electronic textbook sold for use on Connect. Instead, McGraw Hill said it would only pay royalties on "the revenue attributed to the ebook component," a term nowhere defined or even mentioned in its Royalty Contracts.

1  (Complaint ¶ 77.)  In short, McGraw Hill would "unilaterally determine the 'relative

2  value[s]' of the (1) ebook, (2) the Connect platform and (3) the CCC, and pay royalties

3  only on the portion of the electronic textbook that [McGraw Hill] attributes to the

4  ebook."  (*Id.*)

5  D. *The Dismissal of the Present Action*

6        The Complaint alleged, as Plaintiffs' first cause of action, that McGraw

7  Hill's unilateral "reduction" of the sales on which royalties would be paid breached the

8  Publishing Agreements (1) by injecting "new terms that are not present in the Royalty

9  Contracts[']" definition of "'net receipts'"; and (2) by deducting from revenues on which

10  royalties are to be paid the cost of publishing ebooks, costs that contractually should

11  be borne by McGraw Hill.  (Complaint ¶¶ 78-82, 104-06.)  As a second cause of action,

12  the Complaint alleged that McGraw Hill breached an implied covenant of good faith

13  and fair dealing ("breach of covenant"):

14          The change in the way McGraw Hill allocates royalties also
15          constitutes a breach of McGraw Hill's duty of good faith and fair
16          dealing.  By re-defining the "price" of the Connect-platform
17          textbooks as only a fraction of the net receipts of those books,
18          McGraw Hill has arbitrarily reduced the amounts on which
19          royalties are due.  This definitional gamesmanship deprives

authors of the benefit of their bargains with McGraw Hill, and
improperly lines the pockets of McGraw Hill.

(*Id*. ¶ 85; *see id*. ¶¶ 109-114.)

McGraw Hill moved to dismiss the Complaint for failure to state a claim. As to Plaintiffs' breach-of-contract claim, McGraw Hill argued principally that the Contracts' definitions of "net receipts" and the "Work" precluded any claim that an Author was entitled to royalties for the sale of any product other than his or her "Work." In addition, McGraw Hill argued--contrary to the allegations of the Complaint--that Connect is not merely an ebook delivery platform lacking inherent value, as it "is also sometimes sold as a standalone product (devoid of any content) that teachers can populate with their own or third-party materials" and therefore is a distinct product. (Memorandum of law in support of McGraw Hill's motion to dismiss at 4-5, 16.) McGraw Hill argued that Plaintiffs' breach-of-covenant claims should be dismissed as duplicative of their breach-of-contract claims or as conclusory.

In an Opinion and Order dated January 11, 2022, the district court granted so much of McGraw Hill's motion to dismiss as challenged Plaintiffs' claims of breach-of-contract. *See Flynn v. McGraw Hill LLC*, No. 21 Civ. 614, 2022 WL 103537 (S.D.N.Y. Jan. 11, 2022) ("D.Ct.Op."). The court rejected Plaintiffs' claim that McGraw Hill,

pursuant to its new policy, failed to pay royalties on the entire "net receipts" of the "Work," ruling that the "plain text of the Royalty Contracts[] . . . define[s] the 'Work' by title as the textbook itself." *Id*. at *3. The court stated that the Authors thus "are entitled to royalties from net receipts on the textbook and no more"; they "are not entitled to royalties for additional content that Defendants sell with the Work"--including the CCC and access to Connect. *Id*.

The district court also rejected Plaintiffs' contention that McGraw Hill's new royalty payment policy breached the Publishing Agreements' provision that the Publisher is to publish the textbooks at its "own expense." The court stated:

> This argument fails because Connect is more than a publishing platform and includes content in addition to the author's textbook, for example, PowerPoint lesson plans and tests. Connect is therefore *not akin to the ink and paper required to publish a hardcopy textbook* as Plaintiffs assert.

D.Ct.Op., 2022 WL 103537, at *3 (emphasis added).

The district court rejected Plaintiffs' contention that McGraw Hill's consistent practice from 2009 through November 2020 of paying royalties on the entire Connect net sales price was evidence that McGraw Hill's new policy of paying royalties only on a portion of that price breached the Publishing Agreements. The court noted that under New York law, which the Publishing Agreements specified should be the

governing law, a court cannot properly resort to extrinsic evidence to interpret a contract unless the document is ambiguous. The court found that because "the Royalty Contracts unambiguously define the 'Work' as the titles themselves," the Contract is unambiguous on its face, and that the court thus could not consider such extrinsic evidence. *See id*.

However, the district court denied McGraw Hill's motion to dismiss Plaintiffs' second cause of action, which alleged breach of the covenant of good faith and fair dealing ("breach of covenant"). It found that the Complaint plausibly alleged that McGraw Hill had unilaterally and arbitrarily defined the "price" of the Authors' textbooks in order to retain money to which the Authors were entitled. While McGraw Hill argued that the price of the textbooks was fairly set, the court reasoned that that argument suggested the presence of an issue of fact for trial, rather than a basis for dismissal at the pleading stage. *See* D.Ct.Op. 2022 WL 103537, at *3-*4.

Following the entry of the court's order dismissing the contract claims, the parties stipulated that Plaintiffs' only surviving claim, breach of covenant, would be voluntarily dismissed--with prejudice--in order to permit Plaintiffs to appeal the dismissal of the breach-of-contract claims. *See, e.g., Rabbi Jacob Joseph School v. Province of Mendoza*, 425 F.3d 207, 210 (2d Cir. 2005) ("immediate appeal is unavailable to a

1    plaintiff who seeks review of an adverse decision on some of its claims by voluntarily

2    dismissing the others *without prejudice*" (emphasis in original)).  Final judgment was

3    entered dismissing Plaintiffs' Complaint.

4           This appeal followed

5    .                                    II.  DISCUSSION

6           On appeal, the Authors contend that the district court misinterpreted (a)

7    the "net receipts" clauses and (b) the "own expense" clauses of the Publishing

8    Agreements, or at least erred in viewing the "net receipts" clauses as unambiguously

9    precluding their contention that the Contracts require McGraw Hill to pay royalties on

10   total net receipts from sales of products sold on the Connect platform.  For the reasons

11   that follow, we agree only with Plaintiffs' contention that the court should not have

12   dismissed the Complaint for failure to state a claim that McGraw Hill breached the

13   provision that "the Publisher shall publish the Work at its own expense" (or

14   "Publisher's-own-expense" clause).

1      A.  *New York Principles Governing Contract Interpretation*

2             The principles of New York law applicable to these issues are clear and

3      well established.   In a contract action, the court's general objective should be to

4      "determine . . . 'the intention of the parties . . . from the language employed.'"  *Hartford*

5      *Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 171-72, 350 N.Y.S.2d 895, 898

6      (1973) (quoting 4 *Williston on Contracts* § 600, at 280 (3d ed. 1961)).   A court may dismiss

7      a breach-of-contract claim "[a]t the motion to dismiss stage . . . only if," *inter alia*, "the

8      terms of the contract are unambiguous."  *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 13 (2d

9      Cir. 2019) ("*Edwards*") (internal quotation marks omitted).

10            The initial question for the court is "whether the contract is unambiguous

11     with respect to the question disputed by the parties."  *International Multifoods Corp. v.*

12     *Commercial Union Insurance Co.*, 309 F.3d 76, 83 (2d Cir. 2002) ("*International Multifoods*").

13     "Whether an agreement is ambiguous is a question of law for the courts," and

14     "[a]mbiguity is determined by looking within the four corners of the document, not to

15     outside sources . . . ."  *Kass v. Kass*, 91 N.Y.2d 554, 566, 673 N.Y.S.2d 350, 356 (1998); *see*,

16     *e.g.*, *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162-63, 565 N.Y.S.2d 440, 443

17     (1990).   In conducting this inquiry, the court

should examine the entire contract and consider the relation of the
parties and the circumstances under which it was executed.
Particular words should be considered, not as if isolated from the
context, but in the light of the obligation as a whole and the
intention of the parties as manifested thereby. Form should not
prevail over substance and a sensible meaning of words should be
sought.

*Kass v. Kass*, 91 N.Y.2d at 566, 673 N.Y.S.2d at 356-57 (internal quotation marks
omitted).

An ambiguous contract is one whose relevant language is "capable of
more than one meaning when viewed objectively by a reasonably intelligent person
who has examined the context of the entire integrated agreement and who is cognizant
of the customs, practices, usages and terminology as generally understood in the
particular trade or business." *Seiden Associates v. ANC Holdings, Inc.*, 959 F.2d 425, 428
(2d Cir. 1992) ("*Seiden*") (internal quotation marks omitted); *see, e.g., Readco, Inc. v.
Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996) (a "contract is ambiguous where
reasonable minds could differ on what a term means"). But "no ambiguity exists where
the alternative construction would be unreasonable," *id.*, or would "strain[] the contract
language beyond its reasonable and ordinary meaning," *Bethlehem Steel Co. v. Turner
Construction Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93 (1957), or would "produce a
result that is absurd[,] . . . commercially unreasonable[,] . . . or contrary to the

reasonable expectations of the parties," *In re Lipper Holdings, LLC*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561, 562 (1st Dep't 2003).

"A contract is unambiguous where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Edwards*, 938 F.3d at 12 (internal quotation marks omitted); *see, e.g., Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355 (1978)). "Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract," and "'[t]he words and phrases used by the parties must . . . be given their plain meaning . . . .'" *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244, 997 N.Y.S.2d 339, 342 (2014) (quoting *Brooke Group v JCH Syndicate 488*, 87 N.Y.2d 530, 534, 640 N.Y.S.2d 479, 482 (1996)). The contract should be "read as a whole," with every part "interpreted with reference to the whole" in order, *inter alia*, "to give effect to its general purpose," *Williams Press, Inc. v. New York*, 37 N.Y.2d 434, 440, 373 N.Y.S.2d 72, 77 (1975) (internal quotation marks omitted), "to safeguard against adopting an interpretation that would render any individual provision superfluous," *International Multifoods*, 309 F.3d at 86 (internal quotation marks omitted), and to ensure

that particular words and phrases do not receive "undue emphasis," *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528, 837 N.Y.S.2d 600, 603 (2007).

The court is to determine an unambiguous contract's meaning without considering "extrinsic evidence of the parties' intent, such as their course of dealing." *LaSalle Bank National Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 207 (2d Cir. 2005) (internal quotation marks omitted). A party "is precluded from introducing extrinsic evidence" with regard to an unambiguous contract "in order to vary the plain meaning of the writing," *Investors Insurance Co. of America v. Dorinco Reinsurance Co.*, 917 F.2d 100, 104 (2d Cir. 1990), or "to increase [a party's] obligations" where those obligations were "explicitly outline[d]" in the contract itself, *Gerard v. Almouli*, 746 F.2d 936, 939 (2d Cir. 1984).

We review *de novo* both the district court's determination of whether a contract is ambiguous, *see, e.g.*, *Beth Medrash Eeyun Hatalmud v. Spellings*, 505 F.3d 139, 145 (2d Cir. 2007), and its interpretation of an unambiguous contract's terms, *see, e.g.*, *id.*; *Seiden*, 959 F.2d at 429.

B. *"Net Receipts"*

With respect to Plaintiffs' contention that McGraw Hill breached its obligation under the "net receipts" clauses of the Publishing Agreements, we see no error in the district court's rejection of that aspect of the breach-of-contract claims. Although the Authors argue that their Publishing Agreements "unambiguously" (Plaintiffs brief on appeal at 27)--or "ambiguous[ly]" (*id*. at 40)--require the Publisher to pay royalties on its "net receipts" from sales of something other than their textbooks, the Agreements are unambiguously to the contrary. As set out in Part I.A. above, each of the Publishing Agreements defines the Author's textbook as "the 'Work.'" For preparing and delivering their respective "Work[s]" to the Publisher, the Authors agreed to accept--"[a]s full payment"--the specified "percentage[s] of the *Publisher's net receipts* for each copy *of the Work*" sold by the Publisher. (*E.g.*, Flynn Contract § 7(a) (emphases added).)

"Publisher's net receipts" is, in the Agreements, a defined term. It "mean[s] the Publisher's selling price, less discounts, credits, and returns, or a reasonable reserve for returns." (*Id*. § 7(c).) Neither the components of "net receipts" nor the phrase as a whole are ambiguous. And aside from the provision for a reasonable reserve--a factor

20

1     not alleged to be a basis for the breach-of-contract claims--all of the elements defining

2     "Publisher's net receipts" are objectively quantifiable.  There is no ambiguity.

3            As there was no ambiguity in the Contracts with respect to the scope or

4     purpose of the "net receipts" provisions, the district court properly declined to consider

5     extrinsic evidence.  The court correctly concluded that the Publishing Agreements' "net

6     receipts" clauses entitle the Authors only to royalty payments that are based on the

7     sales of their textbooks, not to royalties based on sales of the Core Connect Content

8     related to their textbooks or any other product.  We thus agree that the Complaint

9     failed to state a breach of the "net receipts" aspect of the Contracts.

10     C. *Publisher's-own-expense*

11            We reach a different conclusion with respect to the claim that McGraw

12     Hill breached the Publishing Agreement provision that "the Publisher" is to "publish

13     the Work" "at its own expense," interpreting it in conjunction with other parts of the

14     Contract-- including the "net receipts" clause.  We note that the insufficiency of the

15     Complaint to state a claim for violation of the "net receipts" clause itself does not mean

16     that the "net receipts" clause must be disregarded in other respects.  To the contrary,

17     we consider a contract as a whole; and we view the "net receipts" provision as having

1 implications for the provision that "the Publisher shall publish the Work at its own

2 expense."

3         The Publisher's-own-expense clause appears to be a simple and

4 straightforward statement of the parties' intention that the expense of publishing the

5 Author's textbook is to be borne by the Publisher.  Read in conjunction with the

6 Contracts' royalty provisions, the plain implication is that, in paying the Authors

7 royalties generally in the range of 12 to 19 percent of the revenues it receives on the

8 textbooks' domestic sales (*see*, *e.g.*, Complaint ¶¶ 61, 65, 68, 69), the Publisher is

9 intended to cover its publishing expense from the 80-plus percent share of the sales

10 income that it retains.

11         This interpretation is supported by the precision of the Publishing

12 Agreements' "net receipts" clauses.  The definition of "net receipts" is quite specific in

13 identifying the categories of items that the Publisher can properly deduct from revenue

14 before calculating an Author's royalty.  It states that "[t]he term 'Publisher's net receipts'

15 shall *mean* the Publisher's selling price, less discounts, credits, and returns or a

16 reasonable reserve for returns" (emphasis added); it does not state that the deductibles

17 merely include those categories; and it does not mention publishing expense.  The lack

18 of a publishing-expense element in the Publishing Agreements' precise formula for

determining "net receipts" is consistent with and reinforces the obligation that the Publisher expressly undertook to "publish the Work" "at its own expense."

While the Publisher's-own-expense clause does not go on to explain what is meant by "expense," it must logically be read as referring to "publish[ing]" expenses. In that context, such expenses can reasonably be understood to include, for example, the costs of preparing an accepted manuscript for publication, of promoting interest in purchasing the textbook, of arranging distribution channels, and of distributing the finished product, as well as of endeavors in furtherance of, and preparation for, those publishing efforts.

The district court found the Complaint insufficient to state a claim based on the Publisher's-own-expense clause of the Contracts, stating only that this claim

> fails because Connect is more than a publishing platform and includes content in addition to the author's textbook, for example, PowerPoint lesson plans and tests. Connect is therefore *not akin to the ink and paper required to publish a hardcopy textbook* as Plaintiffs assert.

D.Ct.Op., 2022 WL 103537, at *3 (emphasis added). Given the Complaint's well-pleaded allegations of fact, which must be accepted as true on this Rule 12(b)(6) motion to dismiss, we disagree.

1          As set out in Parts I.B. and C. above, the Complaint describes the nature

2   of McGraw Hill's Connect platform for distribution of the Authors' textbooks and the

3   related, Publisher-generated, Core Connect Content.  The Complaint alleged that

4   McGraw Hill's Connect platform makes available "ebooks" that "are the central element

5   of the Connect platform," and that ebooks "represent electronic versions of the authors'

6   works."  (Complaint ¶ 6.)  It alleged that "Connect," as "[a] Content Management

7   System," is being used "to publish documents with clearly defined ownership" (*id*. ¶ 34

8   & n.1); that the "ebook" is "an online copy of the [text]book identical to its print form"

9   (*id*. ¶ 39); and that the ebook "delivered through . . . Connect . . . allows the books to be

10  viewed online" (*id*. ¶ 37).  Thus, the Complaint plausibly alleged that McGraw Hill

11  publishes the Authors' textbooks through the Connect platform.

12         The availability of content other than the textbooks themselves on the

13  Connect platform does not negate the fact that McGraw Hill publishes the textbooks

14  through Connect.  And that an online platform may be "more than a publishing

15  platform" does not warrant a legal conclusion that it is not a publishing platform at all.

16         Further, the Complaint plausibly alleged that McGraw Hill itself views

17  Connect as having a publishing function that is distinct from the content that is

18  available on the platform.  It quoted an email received by the Authors from McGraw

Hill describing "'the Connect product'" as consisting of "'*three* components,'" which McGraw Hill identified as "'the ebook, *the platform*, and the course-specific content and technology accessed *through* the platform.'" (Complaint ¶ 87 (emphases ours).)

Thus, with all reasonable inferences drawn in Plaintiffs' favor, the Complaint plausibly alleged that McGraw Hill provides online purchasers of the Authors' textbooks with the ability to read a "copy of the book identical to its print form" "'through the [Connect] platform.'" (Complaint ¶¶ 39, 87.) The fact that the platform may be used to distribute additional products does not detract from the plausible allegation that it is in fact being used to distribute the Authors' textbooks.

Finally, the Complaint alleged that McGraw Hill receives a "single unitary price" for a sale through Connect. (Complaint ¶ 38.) It alleged that in 2020, McGraw Hill informed Authors by email that it had discovered a "'way'" to "'attribute[]'" valuation to the "'Connect'" platform component separately from the value of the textbooks and the value of the related course materials that are accessed "'through'" that platform. (*Id*. ¶¶ 76, 87.) McGraw Hill advised that in calculating Authors' royalties, it would deduct from the revenue it received from Connect sales the amount of "'revenue'" that it "'attributed'" to the Connect "platform." (*Id*. ¶ 76.)

Given that McGraw Hill has "'ongoing'" "'operating and administration expense relate[d] to'" "'the Company's digital platform,'" and has acknowledged that "'**these costs have no clear attribution to specific products . . . and do not directly correlate to sales**'" (Complaint ¶ 84 (quoting McGraw Hill's March 31, 2020 annual report to stockholders (emphasis in Complaint))), the Complaint plausibly alleged that McGraw Hill's subtraction from the total Connect sales revenue of an amount that McGraw Hill simply "'attribute[s]'" to the Connect platform is designed to offset McGraw Hill's publishing expense.

We thus conclude that the Complaint pleaded facts sufficient to warrant a plausible inference that McGraw Hill breached the Publisher's-own-expense provision of the Publishing Agreements by reducing the Authors' royalties in order to shift to the Authors some of its expense of publishing their textbooks online.

## CONCLUSION

We have considered all of the parties' contentions in support of their respective positions on this appeal and, except to the extent indicated above, have found them to be without merit.  So much of the judgment of the district court as

1 dismissed Plaintiffs' claims for breach of contract is vacated, and the case is remanded

2 for further proceedings consistent with this opinion.